IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BENJAMIN RICE,[1] | § | No. 206, 2021 |
| | § | |
| Respondent Below, | § | Court Below—Family Court |
| Appellant, | § | of the State of Delaware |
| | § | |
| v. | § | File No. CN20-11-1TK |
| | § | |
| DIVISION OF FAMILY | § | Petition No. 20-25578 |
| SERVICES, | § | |
| | § | In the interest of: |
| Petitioner Below, | § | Thomas Howard |
| Appellee. | § | |

Submitted: November 10, 2021
Decided: January 13, 2022

Before **SEITZ**, Chief Justice; **TRAYNOR** and **MONTGOMERY-REEVES**, Justices.

**O R D E R**

After consideration of the brief and motion to withdraw filed by the appellant's counsel under Supreme Court Rule 26.1(c), the responses, and the Family Court record, it appears to the Court that:

(1) The appellant Benjamin Rice ("Father") filed this appeal from the Family Court's order dated June 1, 2021, terminating his parental rights over his minor child (the "Child"). Father's counsel has filed an opening brief and a motion to withdraw under Supreme Court Rule 26.1. Father's counsel states that she is

---

[1] The Court previously assigned pseudonyms to the parties and the child under Supreme Court Rule 7(d).

unable to present a meritorious argument in support of the appeal. Father has submitted several points for this Court's consideration. For the following reasons, we affirm the judgment of the Family Court.

(2)     The record reflects that the Child was born in April 2019 as a substance-exposed infant.[2] The Delaware Division of Family Services ("DFS") opened an investigation and then a treatment case; the concerns included Mother's housing and employment stability, mental health, substance abuse, and domestic violence. Paternity had not been established; Mother had identified both Father and another person as possible fathers.

(3)     During a meeting between Mother, the other potential father, and DFS in October 2019, Mother became uncooperative and a domestic-violence incident occurred while the potential father was holding the Child, during which Mother scratched the Child. DFS sought custody of the Child. On October 18, 2019, the Family Court entered an *ex parte* order awarding emergency temporary custody of the Child to DFS. DFS placed the Child in a foster home. The Family Court sent notices to Mother and the potential fathers that a preliminary protective hearing was scheduled for October 23, 2019 and advising them of their right to counsel. Father's notice was sent to the wrong address, but it was not returned.

---

[2] The Family Court also terminated the parental rights of the Child's mother ("Mother"). Because this appeal concerns only the termination of Father's parental rights, we focus on the facts and procedural history as they relate to Father.

(4)     At the preliminary protective hearing, Mother appeared, waived her hearing, and requested an adjudicatory hearing.  She also stated that the other potential father was the Child's father.  Neither Father nor the other potential father appeared at the hearing, and the court found dependency with respect to the potential fathers based on their failure to appear.  On October 31, 2019, the court issued orders requiring the potential fathers to undergo paternity testing.  The court sent the order to Father at an incorrect address, but it was not returned.

(5)     On November 26, 2019, the court held an adjudicatory hearing.  Mother appeared and stipulated that the Child was dependent.  Neither Father nor the other potential father appeared at the hearing, and the Family Court found the Child to be dependent based on their failure to appear.  The court also found that the potential fathers had failed to appear for paternity testing and rescheduled the testing.

(6)     On January 7, 2020, the Family Court held a dispositional hearing. Father did not appear for that hearing.  On February 10, 2020, the court entered an order excluding the other potential father as the Child's father based on the results of genetic testing.  On February 10, 2020, the court held a review hearing, and Mother stated that she believed Father was the Child's father.  Father did not appear at the hearing.  The court again ordered that Father engage in paternity testing. Following that hearing, DFS made contact with Father, spoke with him about

paternity testing, and obtained a correct address for him. The court reissued an order for paternity testing to Father's correct address.

(7)     On April 13, 2020, the court held a review hearing. A DFS worker testified that she had spoken with Father, notified him that he was required to engage in paternity testing, and encouraged him to participate in the proceedings; she further stated that Father had expressed reluctance to participate until paternity was established. Father eventually joined the hearing very late. The court asked whether he would like to have counsel appointed for him, and he declined. The court notified Father that he was scheduled for paternity testing on May 14, 2020.

(8)     On June 18, 2020, the Family Court entered an order declaring Father to be the Child's father based on the results of genetic testing. On July 6, 2020, the Family Court held a review hearing, which Father attended. Mother testified that Father had engaged in domestic violence against her during their relationship and testified regarding Father's use of drugs. Father admitted that he had been convicted of possession of marijuana twice in the past year and that he had past convictions for driving under the influence and vehicular assault and reckless endangerment. Near the end of the hearing, the court and Father engaged in a colloquy regarding the appointment of counsel. Father stated that he would like the court to appoint an attorney and stated that his annual income was $75,000. The court determined that he did not qualify for court-appointed counsel.

(9)     On August 12, 2020, the court held an adjudicatory and dispositional hearing for Father.  The DFS worker testified that she began working with the family on October 31, 2019.  She met Father in March 2020, discussed with him the need for paternity testing, and began to include him in the family discussions.  Father told her that he did not want to start planning for reunification at that time, but instead wanted to wait until paternity testing was completed.  After paternity was established in June 2020, Father began visiting with the Child and had approximately three or four visits by the time of the August 2020 hearing.  The court also heard testimony regarding Father's criminal history, including substance-related charges and convictions.  The court approved the case plan that DFS prepared for Father, which included a domestic-violence evaluation and participation in any recommended services; completion of a parenting class; weekly visitation with the Child; and a substance-abuse evaluation and compliance with any recommended treatment.

(10)    On November 2, 2020, when the Child had been in foster care for over a year, DFS filed a motion to change the permanency plan from reunification to concurrent goals of reunification and termination of parental rights for the purpose of adoption.  On November 17 and 20, 2020, the Family Court held a permanency hearing.  During the hearing on November 17, 2020, Father requested appointment of counsel.  Because his employment had changed, the court determined that he was eligible for a court-appointed attorney and that counsel would be appointed, but the

5

court was unable to appoint an attorney in time to participate in the November 17 and 20, 2020 permanency hearing. The court therefore deferred determination of the permanency plan with respect to Father until he had an opportunity to consult with counsel. After hearing evidence regarding Mother's progress on her case plan, the court changed the permanency plan with respect to Mother to concurrent planning, as requested by DFS. The court also heard evidence regarding Father's progress on his case plan. Father was working on parenting classes and had recently learned that he needed to complete domestic-violence classes. Father was having successful weekly visits with the Child. Father had appropriate housing at his mother's home, and he had changed his employment to accommodate his visits with the Child. Father had completed the substance-abuse evaluation and no further treatment had been recommended, but he had not disclosed his recent marijuana-related charges to the evaluator, nor had a urine screen been completed. Because of ongoing concerns about Father's drug use, the court ordered that Father complete a urine screen within seventy-two hours. It does not appear that the court-ordered urine screen was ever completed.

(11) On December 29, 2020, the court held a permanency hearing for Father, at which he appeared represented by counsel. Father stipulated to change the permanency plan to concurrent planning, and DFS agreed to give Father an

6

additional ninety days to work on his case plan.  Father indicated that he would like to increase his visitation with the Child, and DFS agreed to increased visitation.

(12)  On March 23, 2021, the court held a review hearing.  Father appeared at the hearing, represented by counsel.  He expressed that he wanted custody of the Child.  He responded to DFS's concerns about delays in his completion of his case plan by emphasizing that paternity had not initially been established and that he felt that he had gotten fully involved after his paternity was confirmed.  Father had completed his parenting class on February 1, 2021.  Although Father had changed jobs often, he was working and had a small monthly budget surplus, when expenses for the Child were not included.  Father was scheduled for visits with the Child twice per week, though he had missed several visits.  Father was enrolled in the recommended domestic-violence classes.  He had participated in orientation on August 26, 2020 and was scheduled for intake in early September, but he failed to appear.  He appeared for the rescheduled intake in later September.  Father started attending a thirty-week program on January 27, 2021; at the time of the hearing, he had attended five classes and missed two.  Successful completion of the program would require Father to miss no more than five classes.

(13)  On May 12, 2021, the court held a hearing on DFS's petition for termination of parental rights.  The Child had been in foster care for approximately one year and seven months.  Mother did not appear for the hearing; Father appeared,

7

represented by counsel. Based on the evidence presented at the hearing, the Family Court found that Father had attended twelve domestic-violence classes, had missed four, and could only miss one more class in the thirty-class series without being suspended and required to restart the course from the beginning. Father had completed his parenting class and was employed as a carpenter, earning approximately $885 per month, which left a budget surplus when no expenses for the Child were included. Father was scheduled for two visits with the Child each week. The visits went very well, but Father had canceled four visits because of his work schedule. Father testified that he used marijuana to unwind and acknowledged that he had recently received a civil violation for marijuana possession. He also acknowledged that he did not have a valid driver's license because of unpaid child support for his daughter who lived in another state, but that he nevertheless drove a car.

(14) The DFS treatment worker testified that she had first contacted Father by letter in February 2020 and had spoken with him by phone on February 22, 2020. The DFS worker invited Father to participate in the April 13, 2020, hearing, but Father denied paternity and explained that he wanted to wait until paternity testing was completed before becoming involved. The DFS worker had no concerns about Father's housing at his mother's house, but was concerned about his employment because he had worked five different jobs in the past year. The DFS worker was

8

also concerned that Father had not made more progress in the domestic-violence classes, based on Mother's statement that Father physically assaulted her and inconsistent statements from Father regarding the nature of their relationship.

(15) The court also reviewed Father's criminal history, which included several arrests, convictions, and violations involving marijuana, including within two weeks of the hearing; a 2014 conviction for possessing, purchasing, owning or controlling a firearm by a person prohibited; a 2013 conviction for criminal impersonation; and 2011 or 2012 convictions for second-degree vehicular assault and first-degree reckless endangering. The DFS worker also had ongoing concerns about Father's substance abuse and lack of treatment, particularly in light of the fact that Father had not disclosed any marijuana use during the evaluation and had disclosed only the assault conviction—and not his drug-related convictions and arrests—when asked about his criminal history during the substance-abuse evaluation. Father explained that he had not disclosed those issues because he did not believe his marijuana use was a problem.

(16) Considering Father's case plan and the evidence presented, the court found that Father had not satisfied the element of his case plan regarding financial and resource management because of his employment instability. The court determined that Father had only partially satisfied the element of his case plan regarding visitation with the Child because he had attended only approximately half

9

of the visits after requesting that the visits be increased to twice per week. The court found that Father had not completed the domestic-violence element of the case plan because he had already missed four classes and continued to engage in a relationship with Mother that he described as toxic and despite evidence that he was both a victim and perpetrator of domestic violence in that relationship. The court also determined that Father had not satisfied the substance-abuse element of his case plan because he was not truthful during his evaluation regarding his criminal history and his marijuana use. Applying 13 *Del. C.* § 1103(a)(5)a, the Family Court found that DFS had established, by clear and convincing evidence, that Father had failed to plan adequately for the Child's needs and that there were grounds for terminating Father's parental rights under the statute. The court also determined that DFS had made reasonable efforts to reunify Father with the Child. Finally, applying 13 *Del. C.* § 722(a), the court determined that it was in the Child's best interests to terminate Father's parental rights. The court therefore terminated Father's parental rights. Father has appealed to this Court.

(17) This Court's review of the Family Court's decision to terminate parental rights entails consideration of the facts and the law as well as the inferences and deductions made by the Family Court.[3] To the extent that the Family Court's

---

[3] *Wilson v. Div. of Fam. Servs.*, 988 A.2d 435, 439-40 (Del. 2010).

10

rulings of law are implicated on appeal, our review is *de novo*.[4] The Delaware statute governing the termination of parental rights requires a two-step analysis.[5] First, there must be proof of a statutory basis for termination.[6] Second, there must be a determination that termination of parental rights is in the best interests of the child.[7] Both requirements must be established by clear and convincing evidence.[8]

(18) On appeal, Father has presented a number of points for the Court's consideration. First, he argues that the Family Court erred by terminating his parental rights based on his employment changes. He contends that he was terminated from jobs for missing work to attend classes required under his case plan and for visits with the Child; that he communicated with DFS regarding those issues; and that he repeatedly found other jobs, consistently earning at least $17.00 per hour. If the Family Court had terminated Father's parental rights based solely on his job changes, we might agree with Father that the decision was in error in the context of this case, where Father had stable, suitable housing and family support to assist with caring for the Child.[9] But the Family Court here found that Father had failed to

---

[4] *Id.* at 440.

[5] *See* 13 *Del. C.* § 1103 (listing grounds for termination of parental rights); *Shepherd v. Clemens*, 752 A.2d 533, 536-37 (Del. 2000).

[6] *Shepherd*, 752 A.2d at 537.

[7] *Id.*

[8] *Powell v. Dep't of Servs. for Child., Youth, & Their Families*, 963 A.2d 724, 731 (Del. 2008).

[9] *Cf. Craft v. Div. of Fam. Servs.*, 2012 WL 603978, at *4-5 (Del. Feb. 24, 2012) (stating that parental "'unfitness cannot be based on poverty and lifestyle which do not reflect a lack of concern for and ability to care for the children or an unwillingness to receive the child as part of a family,'" and comparing cases involving termination of parental rights based on housing and employment

satisfy numerous elements of his case plan, including the domestic-violence and substance-abuse elements. Moreover, even though the court granted Father additional time to complete his plan, he failed to do so, in part because of the delay resulting from his reluctance to engage with DFS until paternity was established.

(19) Second, Father acknowledges that he waited to become involved in the proceedings until paternity was established, but argues that he has now completed all of the classes that DFS required, including the domestic-violence program. He also argues that he should not have been required to complete a domestic-violence program because the requirement was based on "hearsay" and "an accident." After careful review of the record, we find no reversible error. The Family Court heard testimony from Mother that Father had engaged in domestic violence against her; the court also was presented with evidence that Mother had been found guilty of third-degree assault after she stabbed Father, yet Father continued to engage with her. Father's argument that the court should not have required him to complete a domestic-violence program turns on issues of witness credibility, and we therefore will not substitute our judgment for that of the Family Court.[10] Moreover, because

instability (quoting *In the Matter of Five Minor Child.*, 407 A.2d 198, 200 (Del. 1979), *partially overruled on other grounds by Patricia A.F. v. James R.F.*, 451 A.2d 830 (Del. 1982)).

[10] *See Butler v. Evans*, 2021 WL 245258, at *2 (Del. Jan. 25, 2021) ("On issues of witness credibility, we will not substitute our judgment for that of the trier of fact.").

an appeal is heard on the evidence submitted to the trial court, we cannot consider Father's claim that he has now completed the domestic-violence program.[11]

(20) Third, Father argues that the Family Court erred by terminating his parental rights because he has fully complied with DFS's demands and the requirements of his case plan, and the Child should be with his family. The Family Court's findings that Father had failed to complete important aspects of his case plan at the time of the hearing—when the Child had been in foster care for more than a year and a half and when Father's paternity had been established for nearly a year—and that termination of his parental rights was in the Child's best interests were well supported by the record. As stated above, Father's contention that he later completed his case plan does not create a basis for reversing the Family Court's judgment. We find no error in the Family Court's application of the law to the facts and are satisfied that Father's counsel made a conscientious effort to examine the record and the law and properly determined that Father could not raise a meritorious claim on appeal.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Family Court is AFFIRMED. The motion to withdraw is moot.

BY THE COURT:

*/s/ Tamika R. Montgomery-Reeves*
Justice

---

[11] *Birch v. Dep't of Servs. for Child., Youth, & Their Families*, 2020 WL 3884827, at *4 (July 9, 2020).